UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**RANDALL G. ELLISON**,                         Case No. 5:12 CV 1941

        Plaintiff,                      Magistrate Judge James R. Knepp II

   v.                                           MEMORANDUM OPINION AND ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

        Defendant.

### INTRODUCTION

Plaintiff Randall G. Ellison seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### PROCEDURAL BACKGROUND

On April 22, 2008, Plaintiff filed an application for DIB claiming he was disabled due to left shoulder problems. (Tr. 84-87). He alleged a disability onset date of November 23, 2003. (Tr. 84). His claim was denied initially (Tr. 62) and on reconsideration (Tr. 66). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 112). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (*See* Tr. 7, 25). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981. On July 26, 2012, Plaintiff filed the instant case. (Doc. 1).

**FACTUAL BACKGROUND**

Personal and Vocational History

Born February 16, 1958, Plaintiff was 50 years old on his date last insured. (Tr. 18). Plaintiff obtained his GED in 1978 and had past work experience as a general laborer and dump truck driver. (Tr. 53, 101, 104). These jobs were medium to heavy in exertion and unskilled in nature. (Tr. 53).

Plaintiff lived alone and reported he could perform activities of daily living. (Tr. 538, 558-59, 570, 596, 631, 635). He testified he occasionally drove, shopped for groceries, prepared simple meals, performed some household chores, and could grab a gallon of milk with his right hand, but not his left. (Tr. 32-33, 46, 50-51).

Medical History

To obtain DIB benefits, Plaintiff was required to show he became disabled prior to December 31, 2008, the date his insured status expired. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(A); 20 C.F.R. § 404.131(a). Accordingly, the Court limits discussion of the record to evidence dated through December 31, 2008.

Plaintiff's left shoulder difficulties began on November 24, 2003, when he injured himself on the job – his left shoulder "popped" when he attempted to disengage a safety chain on the tailgate of his dump truck. (Tr. 100, 512-13). On December 3, 2003, Plaintiff sought treatment from orthopedic surgeon Michael Pryce, M.D. (Tr. 200-01). During the office visit, Plaintiff underwent a series of shoulder x-rays, which revealed a one centimeter elevation of the humeral head of the glenoid, with calcifications in the humeral head. (Tr. 203). Orthopedic testing revealed a positive impingement sign, positive Jobe's sign, and weak external rotation. (Tr. 203). This prompted Dr. Pryce to order a series of additional imaging studies.

A left shoulder MRI revealed a bone lesion involving the humeral head and neck, enchondroma (a benign cartilage tumor), a full thickness rotator cuff tear, muscle atrophy in the supraspinatus muscle, and degenerative changes in the acromioclavicular joint. (Tr. 200-02). A left shoulder bone scan indicated a possible fracture/tumor. (Tr. 163). A total body bone scan suggested increased activity in the left humerus associated with trauma/pathologic factor. (Tr. 163, 193). Nerve conduction studies and an EMG revealed C5-C6 radiculopathy/plexopathy and left brachia plexopathy. (Tr. 163, 196-97).

Plaintiff was referred to Drs. Mark Leeson and Steven Lippit for a second orthopedic opinion concerning the tumor in Plaintiff's humerus. (Tr. 177-78). On January 2, 2004, Dr. Lippit found Plaintiff had a large rotator cuff tear of the left shoulder with some overlying chronic changes. (Tr. 176-78). Plaintiff reported pain and said he had been off work since November 27, 2003, "stating no light duty [was] available." (Tr. 177). Ultimately, Dr. Lippet suggested physical therapy and/or surgery. (Tr. 178). On July 1, 2004, Plaintiff underwent shoulder surgery (acromioplasty, mumford, and repair of the rotator cuff). (Tr. 213-14). During surgery, it was determined Plaintiff's rotator cuff was worse than expected – it "was torn completely off the bone". (Tr. 213). Plaintiff was told "the likelihood of [having] a fully functional shoulder after this [wa]s virtually nil", and his prognosis after surgery was "guarded probably poor". (Tr. 213).

Following surgery, Plaintiff began occupational therapy. (Tr. 205-09, 255-304). As predicted, while Plaintiff was able to regain some mobility over the next several months, he still had limitations. By October 1, 2004, Plaintiff could elevate his arm to about 45 degrees and it looked "fairly well" (Tr. 304); in November 2004, Plaintiff could raise his arm to 90 degrees but he lacked endurance (Tr. 292); in December 2004, Dr. Pryce noted Plaintiff was making slow and steady

3

improvement but opined he would never be 100 percent and may have to consider changing jobs in the future. (Tr. 278). By February 2005, Dr. Pryce described a "[h]uge improvement" in Plaintiff's condition. (Tr. 277). Plaintiff could raise his left arm 90 degrees, hold his arms out to the sides, and "do some things with it." (Tr. 277). Nonetheless, Dr. Pryce found Plaintiff had not reached maximum medical improvement (MMI) according to Bureau of Worker's Compensation (BWC) standards. (Tr. 277).

Plaintiff's progress was interrupted in March 2005 when he fell and hurt his shoulder. (Tr. 253-54). Despite the fall and some pain, Dr. Pryce noted Plaintiff's shoulder worked well, he could make a fist, and he had no crepitus. (Tr. 354). X-rays revealed no fracture or tears in the left shoulder and Plaintiff was told to rest for a few weeks (Tr. 353), after which he returned to physical therapy (Tr. 305-54). In June 2005, Dr. Pryce reported Plaintiff could not do overhead activities with his left shoulder but could initiate elevation. (Tr. 330). Dr. Pryce found Plaintiff was gaining strength and was pleased with his recovery. (Tr. 330).

Laura Frailey, a vocational case manager, completed an initial rehabilitation assessment report in August 2005. (Tr. 396-99). Plaintiff reported he had three grown children, lived alone, and had a girlfriend. (Tr. 397-98). Plaintiff stated if he could not return to work as a truck driver, he wished to work in a mail room as a mail clerk. (Tr. 398). Ms. Frailey closed Plaintiff's vocational therapy file due to non-compliance because he missed several scheduled therapy appointments, gave inconsistent answers concerning his absences, failed to return her phone calls, and his attorney advised him not to speak with her. (Tr. 393, 398).

Because he continued to experience pain and limited range of motion in his left shoulder (Tr. 376-77), Plaintiff underwent manipulation and brisement (injection plus insufflation) on January 26,

4

2006. (Tr. 375). Surgery revealed "[t]here were little if any adhesions in [his] shoulder. Once he was completely relaxed, [Dr. Pryce] was able to manipulate [Plaintiff's] shoulder and take it into all ranges of motion with any obvious lysis of adhesions from the manipulation." (Tr. 375). Dr. Pryce opined Plaintiff's prognosis was poor and he would have a life long problem with his rotator cuff. (Tr. 375).

After the surgery, Plaintiff stopped treating with Dr. Pryce and switched to Jim Bressi, D.O., for pain management care. (Tr. 534, 553). In April 2006, Plaintiff reported physical therapy was helping his range of motion, his pain level was 5/10, and his medication helped his pain. (Tr. 558). Plaintiff was able to perform activities of daily living but he said he had difficulty turning his steering wheel while driving and felt this would prevent him from returning to truck driving. (Tr. 558-59). Dr. Bressi extended Plaintiff's physical therapy another ten weeks and continued his medication regimen. (Tr. 559).

In May 2010, Dr. Bressi filled out a BWC form and found Plaintiff would need to be under permanent work restrictions. (Tr. 546). Specifically, he found Plaintiff could lift 21-50 pounds occasionally and 11-20 pounds frequently, but he should not lift more than 25 pounds with his left arm or perform repetitive tasks with his left hand/arm . (Tr. 546). He gave no standing, walking, or sitting limitations but said Plaintiff could only occasionally lift above his shoulders, push and/or pull, and twist, bend, or reach below the knee. (Tr. 546).

On May 10, 2006, Michael Jurenovich, M.D. examined Plaintiff for his worker's compensation claim. (Tr. 552-55). Plaintiff had painful and reduced range of motion in his left shoulder but no atrophy. (Tr. 553). According to BWC standards, Dr. Jurenovich found Plaintiff had reached MMI with the following restrictions: occasionally lift 21-50 pounds; frequently lift 11-20

5

pounds; occasionally twist, turn, reach below the knee; occasionally push, pull, and lift above the shoulders; frequently bend, squat, and kneel; continuously stand, walk, and sit; no lifting more than 25 pounds with the left arm; and no repetitive tasks with the left arm. (Tr. 544).

On August 21, 2006, Plaintiff underwent a three-hour functional capacity evaluation (FCE) with physical therapist Craig Wood, OTR/L. (Tr. 514-20). After testing, Mr. Wood wrote a letter to Dr. Bressi recommending the following work related limitations: no lifting or reaching above shoulder height with the left hand; no more than infrequent reaching greater than ten inches away from the body; not more than 30 pounds when lifting with both hands; no more than ten pounds when lifting with the left hand only. (Tr. 514, 514-20). Mr. Wood also noted Plaintiff expressed a strong desire to return to gainful employment. (Tr. 514). Plaintiff returned to Dr. Bressi a week later and complained of increased pain resulting from the FCE, reporting his pain was 3/10. (Tr. 537). Dr. Bressi adjusted his medications and Plaintiff acknowledged his quality of life improved with pain medication and he could perform activities of daily living. (Tr. 537-38).

On January 5, 2007, Dr. Bressi determined Plaintiff was ready for work rehabilitation and conditioning. (Tr. 512-13; 603-04). Plaintiff reported his pain was 4/10 and Dr. Bressi stated he was doing well on his pain regimen. (Tr. 513, 604). Plaintiff had tenderness and reduced range of motion in his left shoulder, 3/5 strength in his left arm, and full range of motion in his right arm. (Tr. 513).

Plaintiff returned to Dr. Bressi on April 16, 2007 and complained of increased pain because workers' compensation was no longer paying for one of his pain medications. (Tr. 596-97). Plaintiff denied strength or sensation change in his left upper extremity. (Tr. 595). Dr. Bressi noted Plaintiff's left hand grip was equal to his right but his left arm strength was 4/5. (Tr. 596). Plaintiff reported he could perform activities of daily living and his quality of life had improved because of his pain

6

medications, but Dr. Bressi felt he was failing to change as expected and prescribed muscle relaxers. (Tr. 596).

On June 26, 2007, Plaintiff saw Dr. Robert Geiger (from the same practice as Dr. Bressi) and reported his pain level was 5/10 but overall his pain was "moderately well controlled with [his] analgesic regimen." (Tr. 569-70). Dr. Geiger noted Plaintiff had increased pain in his left shoulder, reduced (4/5) range of motion in his left shoulder, full range of motion in his left wrist and elbow, and no swelling or atrophy in his arms. (Tr. 570). Plaintiff felt his analgesia was adequate, he could perform activities of daily living, and his quality of life was improved with medications. (Tr. 570). Dr. Geiger referred Plaintiff to aquatic therapy and requested additional diagnostic testing. (Tr. 570).

On August 26, 2007, a left shoulder MRI revealed postsurgical changes consistent with distal clavicle resection and rotator cuff repair; a small high-grade partial-thickness bursal surface retear but no full-thickness tear; atrophy within the supraspinatus and infraspinatus muscles bellies; a 3.2 centimeter tubular channel extending from the cortical surface just below the greater tuberosity into the proximal metadiaphysis; and non-visualization of the biceps tendon suggesting avulsion and retraction. (Tr. 561). Nerve conduction studies revealed mild left carpal tunnel syndrome, a mild left suprascapular neuropathy, mild left ulnar neuropathy, and mild left ulnar neuropathy at the elbow. (Tr. 567).

Plaintiff saw Dr. Bressi on September 21, 2007, and said he sustained an injury to his left shoulder during an independent medical examination a few days earlier. (Tr. 636-37). Plaintiff reported the examining doctor "unpredictably grabbed his arm while he had his back turned", which Dr. Bressi assumed was to document whether Plaintiff was malingering. (Tr. 636). Dr. Bressi described the injury as an "acute exacerbation directly related to an over-enthusiastic exam". (Tr.

7

636). He noted pain, swelling, and reduced range of motion. (Tr. 363-37). Dr. Bressi administered an injection in Plaintiff's left shoulder, which provided immediate pain relief. (Tr. 637).

On September 24, 2007, Plaintiff sought consultation with orthopedic surgeon Michael Magoline, M.D. (Tr. 697). Dr. Magoline found Plaintiff had a positive left drop test, tenderness in his left shoulder, and marked rotator cuff weakness. (Tr. 697). He opined the August 2007 MRI demonstrated some chronic changes about the rotator cuff, but there was no full thickness tear or impingement. (Tr. 697). Dr. Magoline determined surgery was not appropriate and recommended ongoing pain management. (Tr. 697).

In November 2007, Plaintiff expressed interest in another left shoulder surgery, so Dr. Bressi made a surgical referral. (Tr. 634-35). Despite having just spoken with Dr. Magoline the previous month, Plaintiff reported he had not spoken with a surgeon "in quite some time." (Tr. 634). Dr. Bressi noted left shoulder atrophy and pain on palpation but kept Plaintiff on the same pain regimen. (Tr. 634-35). Similar to most visits with Dr. Bressi, Plaintiff reported he could perform activities of daily living and his pain medications improved his quality of life. (Tr. 635).

On February 15, 2008, Plaintiff reported his pain level was 5/10 and Dr. Bressi noted atrophy in his left shoulder and arm but intact sensation and reflexes, and no swelling. (Tr. 633). Dr. Bressi found Plaintiff had reached MMI because further surgery was not recommended and his condition was stable on his pain medication regimen. (Tr. 632). Dr. Bressi noted Plaintiff had permanent pain from his injury even though his pain medications were "extremely helpful" and he "experienced very favorable effects from pain medication." (Tr. 633). Dr. Bressi also noted Plaintiff's pain medication would need to be continually adjusted to avoid tolerance. (Tr. 633).

In May 2008, Plaintiff told Dr. Geiger he was working with the Bureau of Vocational

8

Rehabilitation to find a job but it was difficult due to pain limitations. (Tr. 630). Plaintiff said his current pain medication regimen was "working adequately" and Dr. Geiger made no changes. (Tr. 630). Similar to other visits, Plaintiff could perform activities of daily living and his quality of life was improved by pain medication. (Tr. 630-31).

Plaintiff treated with the Department of Veteran's Affairs (VA) from August 2008 through December 2008. (Tr. 710-877). He primarily sought relief for pain in his left shoulder and right knee. (Tr. 710-877). In August 2008, right shoulder x-rays were normal and left shoulder x-rays revealed post-surgical and perhaps post-traumatic change, and evidence of derangement of the left rotator cuff. (Tr. 787-88). On September 11, 2008, physician C. Craig Ferris noted Plaintiff had problems with his left shoulder that limited his ability to work. (Tr. 711). Plaintiff was in a car accident on October 30, 2008 and began presenting to the VA for headaches and neck pain, in addition to left shoulder pain. (Tr. 837, 842). Two weeks after the accident, Plaintiff had full strength in his right arm, full bilateral strength in his wrists and hands, and full range of motion in his neck, but decreased range of motion in his left shoulder secondary to pain. (Tr. 729). In November 2008, Plaintiff still experienced pain and limited range of motion in his left shoulder but reported improved pain symptoms with medication and a TENS unit. (Tr. 806-07). On December 4, 2008, Plaintiff complained of left shoulder pain and exhibited reduced range of motion and reduced (4/5) strength in his left shoulder. (Tr. 723-24). Orthopedic surgeon Thomas McLaughlin, M.D. opined Plaintiff's rotator cuff was likely intact but recommended another MRI study. (Tr. 724). A December 11, 2008 MRI showed "no evidence for a tear [of] the supraspinatus tendon but probable bone infarct of the proximal left humerus." (Tr. 785).

9

Opinion Evidence

State agency physician W. Jerry McCloud assessed Plaintiff's functional capacity on August 21, 2008. (Tr. 700-07). Despite Plaintiff's shoulder and knee problems, Dr. McCloud found he could lift 20 pounds occasionally and ten pounds frequently, stand and/or walk for six hours during an eight-hour work day, and sit for six hours during an eight-hour work day. (Tr. 701). Plaintiff's ability to push and/or pull with his upper extremities was limited and he should avoid overhead controls and reaching with his left arm. (Tr. 701-03). Dr. McCloud found Plaintiff could use his left arm for handling on an occasional basis, could use his left arm to support lifting that was primarily performed with his right arm, and had an unlimited ability to use his right arm. (Tr. 701, 703). He reported Plaintiff could frequently climb ramps or stairs; never climb ladders, ropes, or scaffolds; and never crawl. (Tr. 702). Dr. McCloud found Plaintiff's subjective allegations not entirely credible because the record showed his pain medications were effective and he walked without assistance. (Tr. 705). Another state agency physician, Seymour Oberlander, M.D., affirmed Dr. McCloud's assessment on September 9, 2008. (Tr. 708-09).

Hearing Testimony

Plaintiff testified he could not use his left hand to reach into the refrigerator and grab a gallon of milk or reach in the cupboard for a can of soup. (Tr. 43). He is right-handed and said he could grab a gallon of milk with his right hand. (Tr. 43). Plaintiff said he lived alone, shopped for groceries, drove a car, performed some household chores, and prepared simple meals. (Tr. 23-33, 46, 50-51). Plaintiff said his girlfriend performed all household chores in 2008, and since that time, his sister and mother helped. (Tr. 50).

The ALJ asked the VE to consider a hypothetical person of Plaintiff's age, education, and

work experience who could lift 20 pounds occasionally and ten pounds frequently; stand and walk for six hours and sit for six hours in an eight-hour work day; push and pull with the upper extremities on a limited basis; frequently climb ramps or stairs; never climb ladders, ropes, or scaffolds; never crawl; perform occasional handling but no overhead reaching with the left upper extremity; and use the right upper extremity on an unlimited basis. (Tr. 54). The VE opined a person with these limitations could perform unskilled light work existing in significant numbers in the national economy, such as mail clerk, sales attendant, and housekeeper. (Tr. 54-55).

The VE further testified the identified jobs could be performed if the hypothetical individual had the following limitations: no lifting or reaching above shoulder height with the left hand, no more than infrequent reaching greater than ten inches away from the body with the left hand, no lifting more than 30 pounds together with both hands together, and no lifting more than ten pounds with the left hand only. (Tr. 56).

Plaintiff's counsel did not question the VE, so at the conclusion of the hearing the ALJ asked the VE to consider an additional hypothetical person of Plaintiff's age, education, and work experience who was off task 15% of the time because of pain issues, in addition to the limitations she used in the first hypothetical above. (Tr. 57). In response, the VE said such a person could not work. (Tr. 57).

ALJ's Decision

The ALJ found Plaintiff's chronic left shoulder rotator cuff tear, chronic left shoulder pain, chrondomalacia patella, osteoarthritis of the left knee, chronic left knee pain, cervical degenerative disc disease, and morbid obesity were severe impairments that did not medically meet or equal a listed impairment. (Tr. 12-13). The ALJ concluded Plaintiff had the residual functional capacity

(RFC) to perform light work with the following restrictions: he could lift 20 pounds occasionally and ten pounds frequently; sit, stand, or walk for six hours of an eight-hour work day; occasionally push or pull with his upper extremities; his reaching with his left upper extremity was limited to occasional handling and no overhead use; no reaching restrictions with right upper extremity; he could frequently climb ramps and stairs, but never climb ropes, ladders, or scaffolds; and never crawl. (Tr. 14). The ALJ determined Plaintiff could not perform his past work and based on VE testimony, the ALJ found Plaintiff could work a significant number of light jobs existing in the national economy, such as mail clerk, sales attendant, and housekeeper. (Tr. 18-19).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for SSI and DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520– to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also*

*Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff contends the ALJ erred because she failed "to provide a link between the medical evidence she reviewed and why she found [Plaintiff] was not credible." (Doc. 20, at 6). Specifically, Plaintiff alleges the ALJ erred by not addressing his consistent complaints of pain, his testimony, or the effects of medication on his ability to function. (Doc. 18, at 14). Plaintiff also contends the ALJ erred because she relied on the VE's response to an inaccurate description of Plaintiff's limitations. (Doc. 18, at 15-17).

### **Credibility**

The regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. § 404.1529; *see also* Social Security Ruling (SSR) 96-7p, 1996 WL 374186.  For pain or other subjective complaints to be considered disabling, there must be: 1) objective medical evidence of an underlying medical condition; and 2) objective medical evidence that confirms the severity of the alleged disabling pain, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain.  *Felisky v. Bowen*, 35 F.3d 1027, 1038 (6th Cir. 1994). However, the analysis does not end after a summary of the objective medical evidence. *Felisky*, 35 F.3d at 1038. Instead the SSA requires the ALJ to consider certain factors in determining whether a claimant is credible or has disabling pain including: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication, to relieve pain; and 6) any measures used to relieve pain. 20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40. In addition to these factors, an ALJ must review the opinions and statements of the

14

claimant's doctors. *Id.*

On review, the Court is to "accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying." *Id.* (citation omitted). Still, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling (SSR) 96-7p, 1996 WL 374186, *2. In reviewing an ALJ's credibility determination, the Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [Plaintiff's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476.

The record showed there was no doubt Plaintiff experienced left shoulder problems throughout his alleged disability period. To the extent Plaintiff argues the ALJ did not consider his complaints of pain, he is wrong. At the outset, the ALJ explicitly acknowledged Plaintiff's left shoulder and knee pain, and analyzed Plaintiff's claim against that backdrop. (Tr. 14, *referring to* Tr. 292, 304, 330, 513, 553, 559, 569-70, 596, 633, 636-37, 697, 729).

Concerning the ALJ's analysis of Plaintiff's credibility, the ALJ cited the proper regulations and concluded Plaintiff's statements about the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with her RFC finding. (Tr. 16-17). As support, the ALJ cited opinions from Plaintiff's treating physician and other medical providers. Plaintiff is correct that ALJ did not explicitly address his testimony or the effects of medication on his ability to function. (Doc. 18, at 14). However, these are factors an ALJ is required to *consider*

15

when determining Plaintiff's credibility, not explicitly address. 20 C.F.R. § 404.1529(c)(3) (emphasis added); *see also Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 489 (6th Cir. 2005) (*citing Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." ). Instead, the ALJ was required to provide specific reasons, supported by evidence in the case record, which were sufficiently specific to make clear the weight she gave to Plaintiff's statements and the reasons for that weight. SSR 96-7p, 1996 WL 374186, *2.

Here, the ALJ chose to discredit Plaintiff's statements by citing opinions from medical providers which showed he was not functionally limited from performing light work. The ALJ's reasons were sufficiently clear to discredit Plaintiff's statements. Plaintiff testified he could not lift a gallon of milk from his refrigerator or a can of soup from his cupboard. However, the ALJ cited a 2006 report from Dr. Bressi which showed Plaintiff could lift or carry 21-50 pounds occasionally and 20 pounds frequently.[1] (Tr. 17, *referring to* Tr. 546). In addition, the ALJ noted physical therapist Craig Wood's 2006 evaluation that Plaintiff could not lift more than 10 pounds when lifting solely with his left arm, and no more than 30 pounds with both hands together. (Tr. 17, *referring to* Tr. 546). The ALJ also cited Dr. McCloud's 2008 assessment that Plaintiff could occasionally lift or carry 20 pounds and frequently lift or carry 10 pounds. (Tr. 17, *referring to* Tr. 701). In addition to the reports cited by the ALJ, Plaintiff's treating surgeon Dr. Pryce never suggested he had work-preclusive limitations. Rather, he noted Plaintiff would potentially have to change jobs in the future because it was not likely he could return to truck driving. (Tr. 278). Moreover, Dr. Jurenovich found

---

1. The ALJ afforded this opinion "some weight" because she felt the medical record supported greater limitation with respect to Plaintiff's ability to lift.

Plaintiff could lift 21-50 pounds occasionally and 11-20 pounds frequently. (Tr. 544). The ALJ ultimately limited Plaintiff to no overhead use with his left arm, explicitly accounting for Plaintiff's left shoulder pain and functional limitation expressed by his statements and the objective medical record.

The ALJ did not reference the effects of medication on Plaintiff's ability to function. However, again, this is something the ALJ was required to consider, not explicitly reference. In any event, the record showed Plaintiff had highly favorable effects from his medication regimen throughout his alleged disability period. Indeed, his medication regimen was effective despite injuring his shoulder during a fall in 2005 (Tr. 253-54) and a car accident in 2008 (Tr. 837, 842). In 2006, Plaintiff reported physical therapy helped his range of motion and his medication helped his pain (Tr. 558). In January 2007, Dr. Bressi determined Plaintiff was doing well on his pain regimen and was ready for work rehabilitation. (Tr. 513, 604). In April 2007, Plaintiff complained of increased pain but he had stopped taking his pain medication. (Tr. 596-97). By June 2007, Plaintiff's pain was "moderately well controlled with [his] analgesic regimen." (Tr. 569-70). In February 2008, Dr. Bressi noted Plaintiff's pain medication was "extremely helpful" and he "experienced very favorable effects from pain medication." (Tr. 633). In May 2008, Dr. Geiger said Plaintiff's pain regimen was "working adequately", so he made no adjustments. (Tr. 630). Finally, in November 2008, Plaintiff reported improved pain symptoms with medication and a TENS unit following a car accident. (Tr. 806-07).

In addition, Plaintiff's daily activities showed he was not precluded from work activity. At the administrative hearing, Plaintiff said he lived alone, shopped for groceries, drove a car, performed some household chores, and prepared simple meals. (Tr. 23-33, 46, 50-51). He

consistently reported he could perform activities of daily living and his pain medications were helpful and improved his quality of life. (Tr. 538, 558-59, 570, 596, 631, 635).

Apart from Plaintiff's left shoulder, examiners consistently noted unremarkable physical findings. At visits between April 2006 and February 2008, Dr. Bressi noted normal findings with respect to Plaintiff's heart, lungs, and abdomen, and documented a full range of motion in Plaintiff's right arm and 4/5 strength in his right leg. (Tr. 513, 538, 559, 570, 596, 631, 633, 637). In November 2008, an examining VA physician reported Plaintiff exhibit intact sensation throughout, 2+ reflexes throughout, 5/5 strength in his right upper extremity, 5/5 bilateral strength in wrist flexors, extensors, and intrinsic muscles. (Tr. 797). In addition, functional assessments were generally normal except for restrictions concerning Plaintiff's left shoulder. For instance, Drs. Bressi and Jurenovich found Plaintiff could continuously sit, stand, or walk (Tr. 544, 546) and Mr. Wood found Plaintiff had a constant ability to stoop, handle with his left and right hand, and climb stairs, sit, or stand. (Tr. 515).

Plaintiff's pain was an underlying factor in the ALJ's entire opinion, evidenced by her fair, clear, and thorough review of Plaintiff's medical records, and her acknowledgment of it at the forefront of her analysis. (Tr. 14-19). In addition, the ALJ properly evaluated Plaintiff's credibility by providing sufficient reasons for discrediting his statements with support from the record.

## VE Testimony and Step 5 Analysis

To meet his burden at the Fifth Step, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Education & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a

'hypothetical' question." *Id.* If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy*, 594 F.3d at 516-17; *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do"). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

First, Plaintiff asserts the ALJ erred because she did not ultimately incorporate the 15 percent off task limitation in her RFC. (Doc. 18, at 15-17). In addition, Plaintiff says the ALJ erred because she did not present "limitations based on the amount of medications taken or on the issue of failure to concentrate" to the VE. (Doc. 18, at 17).

The hypothetical question which was ultimately the ALJ's RFC fairly set out all of Plaintiff's limitations. There is no evidence of further limitations based on the amount of Plaintiff's medications or their side effects. Rather, as explained above, the evidence clearly showed Plaintiff's pain medication was "extremely helpful" and provided effective results. (Tr. 513, 558, 569-70, 604, 630, 663, 806-07). In February 2008, Dr. Bressi noted Plaintiff's pain medication was "extremely helpful" and he "experienced very favorable effects from pain medication." (Tr. 633). He also noted Plaintiff was stable on his pain medication regimen. (Tr. 632). In May 2008, Dr. Geiger said Plaintiff's pain regimen was "working adequately", so he made no adjustments. (Tr. 630). Even Plaintiff reported his pain regimen helped and was adequate. (Tr. 570, 630).

As noted above, the ALJ properly analyzed Plaintiff's credibility, including his complaints

19

of pain, and she was justified in including, and eventually adopting, those limitations she accepted as credible, which did not include being off task 15 percent of the time. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds substantial evidence supports the ALJ's decision. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

    s/James R. Knepp, II
United States Magistrate Judge